UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SABA CAPITAL MASTER FUND, LTD., and SABA CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiffs,<br><br>    -v-<br><br>BLACKROCK MUNICIPAL INCOME FUND, INC., et al.,<br><br>    Defendants. | 23-cv-5568 (JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

    On June 29, 2023, plaintiffs Saba Capital Master Fund, Ltd. and its investment manager Saba Capital Management, L.P. (collectively, "Saba") filed this suit against 16 funds organized under Maryland law and 11 individual trustees, alleging that the 16 funds each adopted a resolution that violates the "one share, one vote" mandate of the Investment Company Act of 1940. See ECF No. 1. The same day that Saba filed the complaint, it moved for summary judgment. See ECF No. 22. On August 15, 2023, defendants moved to dismiss under forum non conveniens because of forum selection clauses in the bylaws of 14 of the funds that, defendants argued, required this suit to be brought in state or federal court in Maryland. See ECF No. 58. On September 26, 2023, the Court granted that motion in part, dismissing the claims against 5 of the 16 funds (including claims against the individual trustees

1

relating to those 5 funds), but denying the motion to dismiss the claims against the remaining defendants.[1] See ECF No. 79.

On October 31, 2023, various groups of defendants filed various motions to dismiss, raising arguments about lack of standing, lack of personal jurisdiction, failure to state a claim, and misjoinder.[2] See ECF Nos. 87, 90, 93, 106. After full briefing on each of those motions and oral argument on Saba's motion for summary judgment, the Court, on December 5, 2023, issued a "bottom-line" order denying defendants' motions to dismiss and granting summary judgment for Saba, declaring that the resolutions at issue violate Section 18(i) of the Investment Company Act and ordering rescission of the offending resolutions. This Opinion explains the reasons for those rulings.

I.   Factual Background

---

[1] On October 27, 2023, Saba voluntarily dismissed one of the individual trustee defendants, P. Bradley Adams. ECF No. 83. The remaining defendants are BlackRock Municipal Income Fund, Inc. ("MUI"); BlackRock ESG Capital Allocation Term Trust ("ECAT"); Royce Global Value Trust, Inc. ("RGT"); Tortoise Midstream Energy Fund, Inc. ("NTG"); Tortoise Pipeline & Energy Fund, Inc. ("TTP"); Tortoise Energy Independence Fund, Inc. ("NDP"); Tortoise Energy Infrastructure Corp. ("TYG"); Ecofin Sustainable and Social Impact Term Fund ("TEAF"); Adams Diversified Equity Fund, Inc. ("ADX"); Adams Natural Resources Fund ("PEO"); FS Credit Opportunities Corp. ("FSCO"); and 10 individual trustees of ECAT: R. Glenn Hubbard, W. Carl Kester, Cynthia L. Egan, Frank J. Fabozzi, Lorenzo A. Flores, Stayce D. Harris, J. Phillip Holloman, Catherine A. Lynch, Robert Fairbairn, and John M. Perlowski.

[2] One defendant, ECAT, filed an answer. ECF No. 95.

The relevant facts are undisputed. Saba Capital Master Fund, Ltd. holds shares in each of the defendant funds, all of which are closed-end funds organized under Maryland law and covered by the Investment Company Act of 1940. ECF No. 23-1 ("Saba 56.1"), at ¶¶ 1-19. Each defendant fund has adopted a resolution opting into a provision of the Maryland Control Share Acquisition Act that allows a fund to strip the voting rights of any "control shares . . . acquired in a control share acquisition," meaning those shares that would place the holder at 10% or more of a given fund's voting power. Md. Code Ann., Corps. & Ass'ns §§ 3-701, 3-702; Saba 56.1 ¶¶ 24-40 (the "control share resolutions").

II. Legal Background

"The Investment Company Act of 1940 [ICA], 54 Stat. 789, 15 U.S.C. § 80a-1 et seq., regulates investment companies, including mutual funds." Jones v. Harris Assocs. L.P., 559 U.S. 335, 338 (2010). "Congress adopted the [ICA] because of its concern with the potential for abuse inherent in the structure of investment companies." Id. at 339. "Unlike most corporations, an investment company is typically created and managed by a pre-existing external organization known as an investment adviser." Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 536 (1984). "Recognizing that the relationship between a fund and its investment adviser was fraught

with potential conflicts of interest, the [ICA] created protections for mutual fund shareholders." Jones, 559 U.S. at 339.[3]

In relevant part, the ICA provides: "Except as provided in subsection (a) of this section, or as otherwise required by law, every share of stock hereafter issued by a registered management company . . . shall be a voting stock and have equal voting rights with every other outstanding voting stock." 15 U.S.C. § 80a-18(i).[4] The ICA defines a "[v]oting security" as "any security presently entitling the owner or holder thereof to vote for the election of directors of a company." Id. § 80a-2(a)(42). A "[s]ecurity" includes "any . . . stock." Id. § 80a-2(a)(36).

"[A] court may not deny rescission" of a contract that violates the ICA "at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes" of the ICA. Id. § 80a-46(b)(2). This rescission provision "creates an implied private right of action for a party to a contract that violates the ICA to seek rescission of that violative contract." Oxford Univ. Bank v.

---

[3] Here and elsewhere, internal alterations and quotation marks are omitted unless otherwise indicated.

[4] Subsection (a) provides an exception that is not here relevant, for the allowance of a senior security -- "any stock of a class having priority over any other class as to distribution of assets or payment of dividends" -- under certain conditions. 15 U.S.C. § 80a-18(a), (g).

4

Lansuppe Feeder, LLC, 933 F.3d 99, 109 (2d Cir. 2019). The parties agree that under Maryland law, the bylaws of a corporation or statutory trust constitute a contract between the corporation or statutory trust and its shareholders. See Tackney v. U.S. Naval Acad. Alumni Ass'n, Inc., 971 A.2d 309, 318 (Md. 2009) ("A corporation's bylaws are construed under the principles governing contract interpretation."); Chevy Chase Sav. & Loan, Inc. v. State, 509 A.2d 670, 678 (Md. Ct. App. 1986).

### III. Analysis

#### A. Standing

"Article III of the Constitution confines the federal judicial power to 'Cases' and 'Controversies.'" United States v. Texas, 599 U.S. 670, 675 (2023). "Under Article III, a case or controversy can only exist if a plaintiff has standing to sue." Id. "To establish Article III standing," a plaintiff must show that its claimed injury is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013).

"A concrete injury is real, and not abstract." Saba Capital CEF Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund, 88 F.4th 103, 114 (2d Cir. 2023). In determining whether a claimed injury is concrete enough for Article III, "[c]ourts must assess whether the alleged injury to the plaintiff has a close

5

relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." Id. And "[f]or an injury to be particularized, it must affect the plaintiff in a personal and individual way," even if it also affects many others in a similar way. Spokeo, Inc. v. Robins, 578 U.S. 330, 339 & n.7 (2016).

"When an Article III injury hinges on a party's intent to take some future action, the Constitution requires more than mere 'some day intentions.'" Nuveen, 88 F.4th at 111. "A plaintiff's few words of general intent, without substantial evidence of plans, do not support a finding of an actual or imminent injury." Id. "That said, the standing requirement does not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." Id. "Rather, an allegation of future injury is sufficient where the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Id.

Saba has standing to pursue its claims against each of the remaining defendants. Three defendants -- Royce Global Value Trust, Inc. ("RGT"), FS Credit Opportunities Corp. ("FSCO"), and BlackRock Municipal Income Fund, Inc. ("MUI") -- argue otherwise.[5]

---

[5] Because the Court has "an independent obligation to examine" its subject-matter jurisdiction under Article III, the Court must assure itself that a plaintiff has standing even in the absence of any argument to the contrary by a defendant. Nuveen, 88 F.4th at

6

According to RGT, FSCO, and MUI, Saba lacks standing to sue any fund in which it does not already hold 10% or greater of the voting power because its voting rights only become affected -- and, the argument runs, its injury-in-fact only materializes -- at that threshold.

But in Nuveen, a similar suit brought by another Saba entity against closed-end funds under the same provision of the ICA, the Second Circuit rejected this very argument. See 88 F.4th at 110-17. The Second Circuit explained that "Saba's injury," "that its shares' voting rights will be encumbered," is sufficiently concrete for Article III purposes because it "is at the very least analogous to a property-based injury." Id. at 116. The injury is also "particularized" because it individually affects Saba's voting rights based on the shares that Saba itself holds or would otherwise hold. Spokeo, 578 U.S. at 339. Nor is it any bar to standing that, for some of the defendant funds, "Saba has not yet purchased any shares affected by the" control share resolutions because Saba holds less than a 10% stake in those funds. Nuveen, 88 F.4th at 116 n.11. A plaintiff's standing is tied to the specific form of relief sought for the specific injury invoked. See TransUnion LLC v. Ramirez, 594 U.S. 413, 431 (2021)

---

109 n.3. Here, rejecting the arguments made against standing by RGT, FSCO, and MUI also establishes Saba's standing to sue the other defendants.

7

("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)."). And here, "Saba is not suing for retrospective damages, Saba is suing for rescission and a declaratory judgment -- forward-looking relief to prevent the harm from occurring." Nuveen, 88 F.4th at 116 n.11. Consistent with Article III, "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." Id.

To be sure, the imminence of Saba's injury with respect to some of the funds here is not quite so apparent as it was in Nuveen. There, "Saba was the beneficial owner of at least 9.9% of each of the Nuveen fund's outstanding shares." Id. at 111 (emphasis omitted). As a result, Saba was right on the precipice of triggering those funds' control share provisions, which, like those at issue here, "limited the ability of shareholders with holdings greater than 10% in any particular fund . . . to vote any additional shares purchased." Id. at 109. By contrast, although Saba holds shares in each of the defendant funds, it owns, for instance, only about 2.0% of the outstanding common shares of RGT.

8

ECF No. 1-1 ("Kazarian Decl."), at ¶ 16; Saba 56.1 ¶ 14.[6] But here, as in Nuveen, Saba submitted a declaration that it "would have acquired additional shares in the [defendant funds] but for the [control share resolutions]," which "is sufficient to establish imminence." Nuveen, 88 F.4th at 113.[7]

In a sworn declaration submitted as an exhibit to the complaint (and thereby effectively incorporated in it), the portfolio manager for plaintiff Saba Capital Management, L.P. (the investment adviser to co-plaintiff Saba Capital Master Fund, Ltd.), explained that "Saba has been, over time, building

---

[6] Saba owns higher percentages of the outstanding common shares of the remaining defendant funds. See Kazarian Decl. ¶¶ 4-19; Saba 56.1 ¶¶ 2-17. Saba holds more than 10% of the voting power only of BlackRock ESG Capital Allocation Term Trust ("ECAT"), in which it holds approximately 12.8% of the voting shares. Saba 56.1 ¶¶ 2-17.

[7] The Court rejects Saba's alternate theory of standing, that it has suffered an actual and concrete injury merely because it is a "party to an illegal contract -- the Funds' bylaw provisions adopting the Control Share Provisions." ECF No. 104, at 2–3. Saba has not articulated how being a party to an illegal contract imposes on its own a concrete harm. The Supreme Court "has rejected the proposition that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." TransUnion, 594 U.S. at 426. Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." Id. Saba's "party to an illegal contract" argument runs headlong into that principle, seeking to divine standing from a mere statutory violation alone. Instead, Saba's standing is grounded in the encumbrance of its voting rights and investment strategy, which is caused by defendants' conduct and is redressable by the Court.

9

investment stakes in the defendant Funds." Kazarian Decl. ¶ 20. But "[t]he Funds' Control Share Provisions prevent Saba from acquiring voting shares with knowledge that it will be able to acquire enough voting shares to have a meaningful, and in this case rightful (i.e., commensurate with its economic stake), say in matters pertaining to the management of shareholder capital by the defendant Funds." Id. ¶ 21.[8] As a result, "Saba has not acquired, and will not acquire, as many additional shares in the Funds, even at levels below a 10% beneficial ownership stake, as it would were the Control Share Provisions not in effect." Id. ¶ 22. Of critical relevance here, "Saba would acquire more than a 10% beneficial ownership stake in the Funds (to the extent it has not already) were it not for the Funds' Control Share Provisions and the imminent risk that those Control Share Provisions will strip Saba of its equal voting rights." Id. ¶ 27. "Saba's proof amounts to more than mere 'some day intentions' to buy enough future shares to trigger" the control share resolutions. Nuveen, 88 F.4th at 113. "Because Saba's risk of harm is sufficiently imminent and substantial, and that harm is concrete, it meets Article III's

---

[8] "For standing purposes," the Court "accept[s] as valid the merits of" Saba's claims. Fed. Election Comm'n v. Cruz, 596 U.S. 289, 298 (2022).

10

requirements" and Saba has standing to pursue its claims. Id. at 116 n.11.[9]

B. Personal Jurisdiction and Venue

Seven of the defendant funds -- Adams Diversified Equity Fund, Inc. ("ADX") and Adams Natural Resources Fund, Inc. ("PEO") (together, the "Adams Funds"), along with Tortoise Midstream Energy Fund, Inc. ("NTG"), Tortoise Energy Independent Fund, Inc. ("NDP"), Tortoise Pipeline & Energy Fund, Inc. ("TTP"), Tortoise Energy Infrastructure Corp. ("TYG"), and Ecofin Sustainable and Social Impact Term Fund ("TEAF") (together, the "Tortoise Funds") -- have moved to dismiss for lack of personal jurisdiction, contending that they neither transact business in New York nor otherwise possess sufficient relevant contacts with the State.[10] That argument begins from the incorrect premise that the Court's personal jurisdiction hinges on those funds' ties to New York, rather than to the United States as a whole.

---

[9] "A plaintiff must demonstrate standing with the manner and degree of evidence required at the successive stages of the litigation." TransUnion, 594 U.S. at 431. The sworn declaration that Saba submitted as an exhibit to its complaint and again as an exhibit in support of its motion for summary judgment suffices for both the motion-to-dismiss and summary judgment stages.

[10] Unlike Article III's standing requirement or other constraints on the Court's subject-matter jurisdiction, "personal jurisdiction is a personal defense that may be waived or forfeited." Mallory v. Norfolk S. Ry. Co., 600 U.S. 122, 144 (2023) (emphasis omitted).

The ICA is a federal statute that authorizes nationwide service of process. See 15 U.S.C. § 80a-43. "[W]hen a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole." Broumand v. Joseph, 522 F. Supp. 3d 8, 19 (S.D.N.Y. 2021); see, e.g., Mariash v. Morrill, 496 F.2d 1138, 1143 (2d Cir. 1974) ("[W]here, as here, the defendants reside within the territorial boundaries of the United States, the minimal contacts, required to justify the federal government's exercise of power over them, are present.").

Defendants' only real rebuttal to that statement of the law is that Saba did not specifically invoke this basis for personal jurisdiction in the complaint. Instead, the complaint states that "the exercise of jurisdiction over Defendants by this Court [is] permissible under traditional notions of due process and the law of the State of New York, including N.Y. C.P.L.R. § 302." ECF No. 1 ("Complaint"), ¶ 35. But there is no authority for the proposition that a complaint must make legal arguments about every possible source of personal jurisdiction. For personal and subject-matter jurisdiction alike, it suffices that the complaint alleges facts that would establish such jurisdiction. Because both the Adams and Tortoise Funds are organized under Maryland law, they are both "at home" in the United States and have inherently

12

sufficient contacts for the Court to fairly exercise jurisdiction over them. Daimler AG v. Bauman, 571 U.S. 117, 122 (2014).

The parties agree that under the ICA's venue provision, suit may be brought "in the district where the defendant . . . transacts business." 15 U.S.C. § 80a-43. The Adams and Tortoise Funds argue that venue is nevertheless improper in this District because, while the complaint alleges that both funds list their shares on the New York Stock Exchange, see Complaint ¶¶ 11-16, 20, neither "transacts business" here. The Court rejects that argument.

The Adams and Tortoise Funds rely on Gilson v. Pittsburgh Forgings Co., 284 F. Supp. 569 (S.D.N.Y. 1968), which held that a defendant's shares being listed on the New York Stock Exchange did not itself satisfy the "transacts business" requirement for venue under the federal securities laws. See id. at 570-71. According to Gilson, "[a] defendant 'transacts business' in a district within the meaning of Section 27 [of the Securities Exchange Act] only when, among other things, its activities within the district constitute a substantial part of its ordinary business." Id. at 570. The principle from Gilson, which interprets statutory language that is akin to the ICA's venue provision, may arguably have some force when a defendant is an operating company that has some "ordinary business" of which to speak. Id. For instance, the defendant in Gilson was "a maker of steel forgings for railroad cars and motor vehicles," and all of its plants were located in

13

Pennsylvania and Michigan. Id. As a result, "[t]he trading of its shares [was] not really a part of its ordinary business and represent[ed] no activity so far as it is concerned." Id. at 570–71.

Here, however, the defendants are mutual funds that have no "ordinary business" other than to invest the capital provided to them by investors. In service of that business, the Adams Funds concede that they use a New York transfer agent to maintain their registration on the New York Stock Exchange and use New York-based "data resource providers (like Bloomberg) and brokers, all as part of internally managing [their] respective portfolios." ECF No. 87 ("Adams Mem."), at 11. The Tortoise Funds similarly concede that they are listed and trade on the New York Stock Exchange and that, "[f]or execution of investment transactions undertaken by the Funds, the Tortoise Funds use brokers" that have offices in New York. ECF No. 85-1 (declaration of Chief Compliance Officer of the investment adviser to each of the Tortoise Funds), at ¶¶ 2, 6.[11]

---

[11] Although, in resolving a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court is confined to the complaint, any incorporated or integral documents, and matters of judicial notice, the Court is not so limited in resolving a motion to dismiss for lack of personal jurisdiction (or subject-matter jurisdiction). For such jurisdictional questions, the Court may properly consider any declarations submitted by the parties. See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84 (2d Cir. 2013) (explaining that "in deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway" and thus "may determine the motion on the basis of affidavits").

The Court thus holds that the Adams and Tortoise Funds indeed "transact business" in this District by listing their shares on the New York Stock Exchange and by using New York brokers to carry out their own investment transactions.[12] Accordingly, venue under the ICA is proper here.

C. The Individual Trustees' Motion to Dismiss

---

[12] For that reason, the Court could also properly exercise specific personal jurisdiction over the Adams and Tortoise Funds even under the traditional approach of assessing those defendants' contacts with New York, the forum State. New York's long-arm statute allows claims against a defendant who "transacts any business within the state." N.Y. C.P.L.R. § 302(a). The Adams and Tortoise Funds' transactions of business in New York -- including listing on the New York Stock Exchange and relying on New York brokers to manage their portfolios and execute transactions -- are "act[s] by which" they "purposefully avail[]" themselves "of the privilege of conducting activities within the forum State." Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021). Those contacts are the results of the defendants' "own choice[s] and [are] not random, isolated, or fortuitous." Id. at 1025. Indeed, the funds "deliberately reached out beyond [their] home" State of Maryland by "entering a contractual relationship centered" "in the forum State" with their New York listing agents and brokers. Id. Moreover, Saba's claims "arise out of or relate to" the Adams and Tortoise Funds' "contacts with the forum" because -- as Saba contends and defendants do not dispute -- Saba purchased its shares of the funds on the New York Stock Exchange. Id.; see ECF No. 103 ("Saba Opp. to Mems. of Adams and Tortoise Funds"), at 16. And because this suit concerns Saba's rights as a shareholder, there is "an affiliation between the forum and the underlying controversy" sufficient for the fair exercise of specific personal jurisdiction over the Adams and Tortoise Funds. Ford Motor Co., 141 S. Ct. at 1025. Indeed, given that this suit involves the application of federal law by a federal court in New York to shares that were purchased in New York, there is little reason to worry that other potential concerns, such as a concern for "protecting interstate federalism," change the calculus. Id.

The ten remaining individual trustee defendants have moved to dismiss for failure to state a claim and misjoinder, arguing that the complaint's allegations pertain only to the funds and not to the conduct of any trustees. But the complaint alleges that each of the individual defendants was a trustee of defendant BlackRock ESG Capital Allocation Term Trust ("ECAT") at the time ECAT adopted its control share resolution. Complaint ¶¶ 24-33. The complaint further alleges that "all defendants have adopted Control Share Provisions in their governing documents," in violation of the ICA. Id. ¶¶ 40, 42. The natural inference from these allegations is that the individual trustees participated in ECAT's adoption of its control share resolution. Moreover, the complaint seeks relief from the trustees as well as the funds, because it asks for an injunction against all "[d]efendants, their agents and representatives, and all other persons acting in concert with them, from applying the Control Share Provisions." Id. at 12 (Prayer for Relief). As a result, the complaint states a claim against the funds and the individual trustees alike for the same conduct. Because it does so, there is no joinder problem. See Fed. R. Civ. P. 20(a)(2) ("Persons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of

16

transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action.").

   D. Summary Judgment

Proceeding now to the merits, the Court grants summary judgment for Saba on its claims against each of the remaining defendants. Indeed, this result is compelled by the Second Circuit's decision in Nuveen, which held that similar control share resolutions adopted by closed-end mutual funds violate the ICA's requirement "that every share of common stock issued by a regulated fund be 'voting stock' and 'have equal voting rights' with other shares." 88 F.4th at 117 (quoting 15 U.S.C. § 80a-18(i)).

Section 18(i) of the ICA states that, "[e]xcept as provided in subsection (a) of this section, or as otherwise required by law, every share of stock . . . issued by a registered management company . . . shall be a voting stock and have equal voting rights with every other outstanding voting stock." 15 U.S.C. § 80a-18(i). In turn, the ICA "defines the term 'voting security' as 'any security presently entitling the owner or holder thereof to vote for the election of directors of a company.'" Nuveen, 88 F.4th at 117 (quoting 15 U.S.C. § 80a-2(a)(42)). And, as noted earlier, the ICA further clarifies that "'security' encompasses 'stock.'" Id. (quoting 15 U.S.C. § 80a-2(a)(36)). As the Second Circuit explained, the ICA's "language is plain and unambiguous." Id. "In addition to requiring that all investment company stock be voting

17

stock, the statute defines it with reference to its function –– that it 'presently entitles' the owner to vote it." Id. (quoting 15 U.S.C. § 80a-2(a)(42)).

Defendants' control share resolutions –– which strip the voting rights of shares that would otherwise place any holder at or above 10% of a given fund's voting power –– violate the ICA in two distinct ways. First, "if an owner of [defendants'] stock cannot 'presently' vote their stock, the stock loses its function and is not 'voting' stock." Id. Second, the control share resolutions "deprive[] some shares of voting power but not others –– contrary to [Section 18(i)'s] guarantee of 'equal voting rights.'" Id.

The only argument defendants make here that the Second Circuit did not specifically consider and reject in Nuveen is that, because the control share resolutions at issue are permissible under Maryland law, they are "otherwise required by law" and thus safe from Section 18(i)'s mandate of equal voting rights. 15 U.S.C. § 80a-18(i). The fatal flaw in that argument is rather easy to spot. The fact that Maryland law allows funds to adopt such control share resolutions does not in any way mean that Maryland law requires as much.

Because the control share resolutions plainly violate Section 18(i) of the ICA, the Court orders that each of the offending resolutions be, and hereby is, rescinded. When a contract,

18

including a provision of the bylaws of a corporation or statutory trust, violates the ICA, "a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of" the ICA. Id. § 80a-46(b)(2); see Nuveen, 88 F.4th at 115 & n.10. Rescission of the offending resolutions is thus mandatory under the ICA unless two conditions are both met: (1) leaving the offending provisions in place "would produce a more equitable result" than rescission and (2) denying rescission would not be "inconsistent" with the ICA's aims. 15 U.S.C. § 80a-46(b)(2). Defendants argue that discovery is needed so they may make those two showings. The Court disagrees. Although "a court may not deny rescission" unless those showings have been met, "[e]quitable balancing is not required to grant rescission." Nuveen, 88 F.4th at 120 n.16. Moreover, the ICA unambiguously allows a court to grant rescission even if those showings have indeed been met. Accordingly, the Court declines defendants' invitation to prolong this litigation for the mere chance at making a showing that would not change the result.[13]

---

[13] Even if the Court permitted discovery, defendants cannot show that "the denial of rescission . . . would not be inconsistent" with the ICA's purposes. 15 U.S.C. § 80a-46(b)(2). Indeed, "Congress passed the ICA to provide a comprehensive regulatory scheme to correct and prevent certain abusive practices in the management of investment companies for the protection of persons

19

IV. Conclusion

For the reasons explained above, the Court denies each of the motions to dismiss, and grants summary judgment for Saba on all claims against the remaining defendants. The Court declares that the control share resolutions at issue violate Section 18(i) of the ICA and orders that those resolutions be rescinded forthwith. The Clerk is respectfully directed to enter final judgment and close this case.

New York, NY
January 4, 2024

JED S. RAKOFF, U.S.D.J

---

who put up money to be invested by such companies on their behalf, i.e., the shareholders." Nuveen, 88 F.4th at 120. "These corrections were enacted for the benefit of investors, not fund insiders, and passed primarily to correct the abuses of self-dealing." Id. (citation omitted). "The ICA's statements of policy reflect Congress's apprehension about certain practices employed by investment companies." Id. The facts that defendants assert discovery could reveal -- that Saba may become a concentrated shareholder who negatively impacts the funds' respective values -- would not mean that the control share resolutions support the ICA's "policy objectives by stripping shares of voting rights unequally." Id. at 121.